UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMES EDWARD KING,

        Petitioner,

   v.

SCOTT FRAUENHEIM,

        Respondent.

Case No.  14-cv-05267-SI

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

James Edward King filed this pro se action for a writ of habeas corpus under 28 U.S.C. § 2254.  The court issued an order to show cause why the writ should not be granted. Respondent has filed an answer and King has filed a traverse. For the reasons explained below, the petition is DENIED.

## BACKGROUND

A.    Procedural History

In 1997, King was convicted of four sex crimes against a minor and sentenced to 35 years to life in prison. In 2009, this court granted King's petition for writ of habeas corpus and ordered that he be re-tried or released from custody.[1]  After King rejected a plea offer from the prosecutor, a second trial was held.

At the second jury trial in Monterey County Superior Court, King was convicted of rape of a child under age 14, oral copulation on a child under age 14, penetration with a foreign object on a child under age 14, and committing a lewd act with a child under age 14.  On April 13, 2010, he

---

[1] The petition was granted due to ineffectiveness of the petitioner's counsel in his failure to consult a medical expert for trial preparation.  *See King v. Evans*, 621 F. Supp. 2d 850 (N.D. Cal. 2009).

was sentenced to a prison term of 35 years to life.

King appealed and sought collateral relief in the state courts following the 2010 conviction. The California Court of Appeal affirmed the judgment of conviction and denied his habeas petition in 2013. The California Supreme Court denied his petition for review and his petition for writ of habeas corpus in 2014. He then filed this action.

B.    Trial Evidence

The California Court of Appeal described the facts of this case as follows:

I. The Prosecution's Evidence

J. was 13 years old in the summer of 1997. She and her mother lived in rented rooms in a Salinas house owned by Doug Dobell, who also lived there. Defendant, who was 42 years old, was a friend of J.'s mother and Dobell, and defendant had previously lived in Dobell's house before J. and her mother lived there   [Footnote omitted] Around August 1, 1997, defendant came to the house to visit J.'s mother and J.'s mother's friend Eric Barton, who was a longtime friend of defendant. Defendant asked if J. could come with him to the liquor store so she could get a soda. J.'s mother agreed, and defendant drove J. to a nearby liquor store. He bought beer, and she got a soda.

On their way back, defendant pretended to be lost. He "spread her legs apart," "put two fingers" in her vagina, and then put his fingers in his mouth. She "told him no." When they returned to the house, J.'s mother and Barton were in J's mother's room with the door closed.[3] J. got a book from her room, "laid down on the couch," and began reading her book. Defendant put the beer away in the refrigerator. J.'s mother came out of her room, got a beer, and returned to her room. J. did not tell her mother what had happened with defendant in the car because she was "scared" that her mother would "[l]ose her temper."

Footnote 3:  J.'s mother had testified at the 1997 trial that she and Barton were taking a shower that was so long that the hot water ran out.  She estimated that their shower took about 30 minutes

Defendant "grabbed [J.'s] arm," covered her mouth, and pulled her to the garage. In the garage, defendant forced J. down on a piece of carpet and proceeded to commit a series of sex acts on her there. While J.'s 2010 trial testimony, her 1997 statements to the police, and her 1997 trial testimony were inconsistent in terms of the order and number of sex acts, she consistently said that defendant had raped her multiple times, forced her to orally copulate him, and kissed her bare chest. Defendant interrupted his assault on her to go to the kitchen and get himself a beer before resuming his assault.

Some of the "white stuff" that came out of defendant's penis during the oral copulation fell on the carpet. When defendant was done committing these sex acts on her, he threatened to kill her if she told anyone. Both of them then returned to the living room.

J. did not immediately tell her mother of these events. The first person J. told about defendant's assault on her was J.'s friend Erica Meharg. A week or two later, J. told her mother. She did not tell her mother right away because she "was scared." After J. told her mother, her mother "lost it" and was "[y]elling and screaming." The next day, J. was taken to the police station and told the police about the incident during a video-recorded interview.

Nearly three weeks after the incident, J. was examined by a sexual assault examiner. J.'s genitals were "very red" at the time of the examination due to an unrelated vaginal yeast infection. Nevertheless, the examiner saw a "red spot" on the roof of J.'s mouth, "red streaks" on her cervix, and "red dots" and a "cleft" on her hymen that the examiner believed could have been caused by the sexual assault that J. described. The examiner concluded that her observations were consistent with J.'s report of the assault. She explained that, for her, "consistent with" meant that "it is possible it happened this way." . . .

II.  The Defense Case

The defense pointed out numerous inconsistencies between J.'s 2010 trial testimony, her 1997 trial testimony, her 1997 statements to the police, and her other statements to the prosecution. J. testified at the 2010 trial that the first sex act in the garage was rape, and defendant never asked her to touch him or made her touch him. At the 1997 trial and in her 1997 police interview, J. testified that the first thing that happened in the garage was that defendant forced her to touch his penis before raping her. At the 2010 trial, J. testified that the first rape was followed by defendant kissing her chest, after which he went to the kitchen for a beer, and then returned to rape her again and then forced her to orally copulate him. In her 1997 statement to the police, she said that the next sex act after the first rape was the oral copulation, followed by another rape, followed by the kissing of her chest, followed by another rape before he went to the kitchen for a beer, and one more rape after he returned. In her 1997 trial testimony, she testified that the second sex act was oral copulation, followed by a rape, followed by his trip to the kitchen for a beer, followed by a second oral copulation, a rape, the chest kissing, and another rape.

The defense also pointed out that J. described defendant during the rapes having his hand over her mouth, holding her arms over her head, and also using his hands to push her clothing aside. The defense also highlighted the fact that the garage was adjacent to the kitchen, and the door between the kitchen and garage had a large clear window in it. The defense cast doubt on J.'s testimony based on her claim that the assault lasted 75 minutes.

The defense made much of the fact that no semen had been found on a carpet remnant seized by the police. Because J. had reported that

3

defendant ejaculated onto the carpet, a police officer was sent to her house to collect the "light brown" carpet in the garage that J. had described.[4] Dobell directed the officer to a carpet remnant in the garage. The officer collected the dirty "light brown" carpet remnant that Dobell directed him to. A lab test on this carpet remnant was negative for semen. When J. was told in November 1997 of the lab test result, she said that a dog had chewed up part of the carpet, and her mother had cut off that portion and thrown it away. At the 1997 trial, J. testified that the carpet was blue. When she testified at the 2010 trial, J. said that she could not recall what the carpet looked like. Dobell testified that there had previously been a blue carpet at that location in the garage.

> Footnote 4: At the 1997 trial, J. testified that defendant ejaculated into her mouth. She "tried to spit it back out, and some of it went on the carpet." Defendant told her not to spit it out but to swallow it, so she only spit a little on the carpet.

The defense identified inconsistencies in J.'s statements about who, what, and when she had told others of the assault. J. testified at the 2010 trial and at the 1997 trial and told the police in the 1997 interview that the only two people she had told were Meharg and her mother. She testified in 2010 that she told Meharg the day after the incident while the two girls were roller blading outside. During the 1997 police interview, she said that she told Meharg on the same day as the incident. Meharg testified at the 2010 trial that J. told her in J.'s bedroom and that Dobell was home at the time. It was undisputed that Dobell had left the house to spend a week in Las Vegas a day or two before the incident. Dobell testified that J.'s mother and J. told him that J. had been molested, which was what motivated him to call the police. J. told the police in 1997 that she had told Eli about defendant's assault. J. testified at the 2010 trial that she told the police that she had told "the whole story" to her mother. After the police told her that her mother had said that J. had told her only that defendant tried to have sex with her but did not succeed, J. "changed her story" and told the police that she had not told her mother everything because she did not want to upset her.

The defense presented evidence aimed at suggesting that the allegations had been fabricated and made by J. at her mother's behest. Evidence was presented that, on the day after J. told her mother about defendant's assault, J.'s mother left the house because "she was fighting with" Dobell. Dobell and defendant were friends. Dobell contacted the police, and, when the police arrived and asked J. if she had been sexually assaulted by Dobell, she said no. Then they asked her if anyone had assaulted her at the house. She again said no.[5] The police then told her that Dobell had said that J.'s mother had told him that defendant had sexually assaulted J. J. responded by telling the police that defendant had assaulted her. Barton testified that J.'s mother had tried to sell a moped in late July 1997, and defendant had told her that she could not do so because the moped belonged to Dobell. That made J.'s mother angry, and she said "I'll get you back." J.'s mother had testified at the 1997 trial that Dobell had accused her of taking his property and damaging his house. Dobell testified that, when he drove J. and her mother to the hospital for J. to be examined by the sexual assault examiner, J.'s

4

mother told him that she was upset with him "for having called the police before she and her daughter could ... get their story straight." Greg Pete Manibusan (Pete), J.'s mother's former boyfriend, testified that he had told J. to tell him if anyone ever did anything improper to her. He was staying at Dobell's house for a few days before and after the incident, and J. "appeared normal."

> Footnote 5: J. testified on direct examination at the 2010 trial that she said no because "I did not know why they were there."

The defense presented testimony by Barton aimed at showing that defendant had no opportunity to be alone with J. in the garage and that J. did not exhibit any antipathy toward defendant. Barton testified that he had been to J.'s home three times and had seen her hug defendant there. He was there on the day of the incident, as were J., her mother, "Pete," "Bonnie," and "Eli."[6] Barton remembered J. seeking and obtaining her mother's permission to go with defendant to the store. They were gone for about 15 minutes. When they returned, Barton and J.'s mother left her bedroom, and Barton and defendant went into the back yard to smoke and drink beer. Barton insisted that Pete and Eli were also at the house at that time. Barton saw J. in the living room putting on her roller skates. After "a few beers," Barton and defendant left the house. On their way out, J., as she usually did, "gave us both a hug." Defendant and Barton went to defendant's cousin's house, where they spent the rest of the day.

> Footnote 6: Barton's testimony was heavily impeached. . . .

The defense also presented evidence directed toward establishing that J. had been sexually assaulted by someone other than defendant. Sometime after J. reported the molestation to the police, Dobell found some letters and a diary in J.'s room, and, in November 1997, he gave these to the prosecutor's investigator. One of these letters, exhibit 11, was introduced at trial. The letter expressed romantic feelings for someone and encouraged that someone to come see her at night. Although J. testified that exhibit 11 was a letter that she wrote to defendant after the incident, the letter stated that it was to "my honey Elie."[7] Entries in the diary indicated that J. had romantic feelings for Eli and suggested that the two of them had been physically involved. In January 2010, J. told the prosecutor's investigator that she had a "mumbled or jumbled" memory of defendant making her orally copulate him in the living room. In February 2010, J. told the investigator that the incident in the living room had not involved defendant but instead Eli. At the 2010 trial, J. testified on direct examination that she now remembered that she had "perform[ed] oral sex in the living room" on "my mom's friend Eli" some time in 1997 though she had not told the police about that until 2010. She said that she did not reveal this incident because "[m]y mom didn't believe me." J.'s mother had testified at the 1997 trial that Eli stayed at the house for two nights while Dobell was gone. J.'s mother saw J. touching Eli's hair. J. also testified that she had been sexually assaulted by friends of her mother when she was eight years old and four years old.

1  Footnote 7:  J. testified that she "was confused and lost and had mixed feelings" about defendant's assault on her.  "I figured it was part of life, so I thought I had feelings for him."

The sexual assault examiner's testimony was heavily challenged on cross-examination. She conceded that most of the redness was from the yeast infection, but she insisted that the yeast infection could not account for the red spots, the streaks, and the mouth injury. A doctor who specialized in medical evaluation of sexual abuse testified as an expert for the defense. He testified that "genital injuries heal quickly," generally within a week. A study had shown that, except in "very rare" cases where there are "horrific" injuries, bruises and abrasions would not be present three weeks after an assault. He explained that redness is "a nonspecific finding, and because of its uncertain clinical significance, is not considered to be certain evidence of trauma." The defense expert had reviewed the evidence of J.'s examination, and he concluded that "there was nothing about her physical exam that appears to be abnormal insofar as evidence of prior trauma." Nothing found by the examiner "appeared to be healing trauma." The defense expert saw no physical evidence of a sexual assault. The defense expert had reviewed the examiner's photographs of J.'s hymen and found that there was no "cleft" or "notch." In addition, studies had shown that "superficial notches" are normal and not the result of abuse. He saw no evidence of a bruise to the roof of J.'s mouth.

California Court of Appeal Opinion filed December 30, 2013 in *People v. King*, No. H036078, 2013 WL 6860504, *1-4 (Cal. Ct. App. December 30, 2013).

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Monterey County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to

6

any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id*. at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803. The presumption that a later summary denial rests on the same reasoning as the earlier reasoned decision is a rebuttable presumption and can be overcome by strong evidence. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605-06 (2016). Although *Ylst* was a procedural default case, the "look through" rule announced in that case has been extended beyond the context of procedural default and applies to decisions on the merits. *Barker*, 423 F.3d at 1092 n.3. In other words, when the last reasoned decision is a decision on the merits, the habeas court can look through later summary denials to apply § 2254(d) to the last reasoned

7

decision.

Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id.* at 102.

# DISCUSSION

A.    Due Process Claim Based On Evidence Regarding J.'s Motivation For Testifying

    1.    Background

J. made a statement in 2010 to an investigator to the effect that the reason she wanted to testify at the trial "is that she now has a young child, and she wants to prevent [King] from molesting any other children." CT 212. The defense moved *in limine* to exclude evidence at the trial regarding J.'s motivations for testifying.[2] The defense argued that J.'s statement that she was testifying to protect her children was irrelevant, was highly prejudicial in that the statement would "appeal[] to the jury's sympathy that she is doing this for some 'greater good,'" and assumed "that King molested this witness in the first place, and she wants to stop him from doing it to anyone else." CT 213. The prosecution countered that J.'s motivations for testifying were "very relevant to her credibility in this case," and that "it is a key issue in terms of her credibility for the jury to know why she's still willing to come here after twelve years and testify in this case." RT 362. The trial court ruled *in limine* that, "at the outset that the prosecution ought not to go there. After you gentlemen [the defense] have at her, I may have a different feeling about what she may talk

---

[2] Unless otherwise noted, all references to the "trial" refer to the trial in 2010. The earlier trial will be identified as the 1997 trial.

about. . . . I assume you're going to insinuate that she's lying, and then it may be relevant to ask what her motivation is for being here." RT 363.

During trial, the defense cross-examination attempted to demonstrate that J. had made up her allegations against defendant. On redirect examination, and after unsuccessful defense objections, J. testified as to the reasons she chose to come to testify: "I came here to make myself a stronger person and to protect my own children." RT 1891-93.

King contends that this portion of J.'s testimony was "blatantly false" and its admission violated his rights to due process and a fair trial. Docket No. 1 at 23.

The California Court of Appeal rejected the challenge to the admission of this evidence. The state appellate court discussed why the evidence was properly admitted under state law:

> The defense's cross-examination of J. attempted to demonstrate that she had fabricated her allegations against defendant. This claim of fabrication raised the obvious question of why J. would continue to make fabricated allegations after the passage of 12 years. J.'s testimony that she was testifying at the 2010 trial voluntarily had a "tendency in reason" [Cal. Evid. Code § 210] to discount the inference that she was maintaining her allegations under compulsion by the prosecution. Her statement of her reasons for testifying gave the jury an alternative explanation for her willingness to subject herself to this ordeal that had a "tendency in reason" to rebut suggestions by the defense that she had a motivation to fabricate these allegations.
>
> Defendant also contends that the trial court should have excluded J.'s testimony on this point under Evidence Code section 352. . . .
>
> J.'s testimony on this point did not consume substantial time and had no tendency to confuse the issues or mislead the jury. Defendant's only possible challenge to this evidence under Evidence Code section 352 was that (1) it was likely that this testimony would create a substantial danger of undue prejudice, and (2) the risk of prejudice substantially outweighed the probative value of the evidence. The trial court could have rationally concluded that there was no danger of undue prejudice to defendant from J.'s testimony that she was testifying voluntarily to make herself stronger and protect her children. The fact that this testimony countered the defense's claim that J. had fabricated her allegations was what naturally flowed from this probative, relevant evidence. While J.'s reference to protecting her children had some potential to appeal to the jury's sympathy, this potential was not so great that it created a unique emotional bias against defendant. It is commonplace that parents want to protect their children. J.'s testimony had force only if the jury believed that J. had not fabricated her allegations; it was not likely that the jury would believe her merely because she claimed to be testifying to protect her children. The trial court did

not abuse its discretion in permitting this testimony.

*King,* at \*6-7.

Although the state appellate court did not discuss the federal constitutional claim which had been presented to it, the decision is presumed to be a rejection of the federal constitutional claim on the merits. *See Harrington*, 562 U.S. at 99. Thus, this court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id.* at 102.

### 2.    Analysis

The United States Supreme Court has never held that the introduction of propensity or other allegedly prejudicial evidence violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 68-70 (1991); *id.* at 75 n.5 ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime").

In *Estelle v. McGuire*, the defendant was on trial for murder of his infant daughter after she was brought to a hospital and died from numerous injuries suggestive of recent child abuse. Defendant told police the injuries were accidental. Evidence was admitted at trial that the coroner discovered during the autopsy older partially healed injuries that had occurred six to seven weeks before the child's death. *Id.* at 65. Evidence of the older injuries was introduced to prove "battered child syndrome," which "exists when a child has sustained repeated and/or serious injuries by nonaccidental means." *Id.* at 66. The state appellate court had held that the proof of prior injuries tending to establish battered child syndrome was proper under California law. *Id.* In federal habeas proceedings, the Ninth Circuit found a due process violation based in part on its determination that the evidence was improperly admitted under state law. *Id.* at 66-67. The U.S. Supreme Court first held that the Ninth Circuit had erred in inquiring whether the evidence was properly admitted under state law because "'federal habeas corpus relief does not lie for errors of state law.'" *Id.* at 67. The Supreme Court then explained:

> The evidence of battered child syndrome was relevant to show intent, and nothing in the Due Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence simply because the defense chooses not to contest the point. [¶] Concluding, as we do, that the prior injury evidence was relevant to an issue in the case, we need not explore further the apparent assumption of the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial. We hold that McGuire's due process rights were not violated by the admission of the evidence. *See Spencer v. Texas*, 385 U.S. 554, 563–564, 87 S.Ct. 648, 653–654, 17 L.Ed.2d 606 (1967) ("Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial . . . . But it has never been thought that such cases establish this Court as a rulemaking organ for the promulgation of state rules of criminal procedure").

*Estelle v. McGuire*, 502 U.S. at 70 (omission in original).

The cited case, *Spencer v. Texas*, 385 U.S. at 563, held that the admission of evidence of prior convictions did not violate due process. The Supreme Court explained in *Spencer* that, although there may have been other, perhaps better, ways to adjudicate the existence of prior convictions (e.g., a separate trial on the priors after the trial on the current substantive offense resulted in a guilty verdict), Texas' use of prior crimes evidence in a "one-stage recidivist trial" did not violate due process. *Id.* at 563-64. "In the face of the legitimate state purpose and the long-standing and widespread use that attend the procedure under attack here, we find it impossible to say that because of the possibility of some collateral prejudice the Texas procedure is rendered unconstitutional under the Due Process Clause as it has been interpreted and applied in our past cases." *Id.* at 564.

*Estelle v. McGuire* also cited to *Lisenba v. California*, 314 U.S. 219, 228 (1941), in support of the conclusion that the introduction of the battered child syndrome evidence did not so infuse the trial with unfairness as to deny due process of law. *See Estelle v. McGuire*, 502 U.S. at 75. In *Lisenba*, the Supreme Court rejected a claim that the admission of inflammatory evidence violated the defendant's due process rights. The evidence at issue in *Lisenba* was live rattlesnakes and testimony about them to show they had been used by the defendant to murder his wife. The Court explained that it did not review questions of the propriety of state law evidence decisions by the judge. "We cannot hold, as petitioner urges, that the introduction and identification of the snakes so infused the trial with unfairness as to deny due process of law. The fact that evidence

11

admitted as relevant by a court is shocking to the sensibilities of those in the courtroom cannot, for that reason alone, render its reception a violation of due process." *Lisenba*, 314 U.S. at 228-29.

These three Supreme Court cases declined to hold that the admission of prejudicial or propensity evidence violates the defendant's due process rights. No Supreme Court cases since *Estelle v. McGuire* have undermined the holdings in these three cases. In other words, there is no Supreme Court holding that the admission of prejudicial or propensity evidence violates due process.

The Supreme Court has established a general principle of "fundamental fairness," i.e., evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process. *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (due process was not violated by admission of evidence to identify perpetrator and link him to another perpetrator even though the evidence also was related to crime of which defendant had been acquitted)). Thus, the court may consider whether the evidence was "so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Id.*

The admission of prejudicial evidence may make a trial fundamentally unfair and violate due process "[o]nly if there are no permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions." *Id.* The admission of evidence will violate due process only if there are *no* permissible inferences the jury may draw from the evidence and the evidence is "'of such quality as necessarily prevents a fair trial.'" *Jammal*, 926 F.2d at 920 (internal citation and footnote omitted).

Here, King does not show that the admission of evidence as to J.'s motivation for testifying meets the very demanding standard of being so extremely unfair that its admission violates fundamental conceptions of justice. King concedes that "J.'s willingness to voluntarily testify was relevant to her credibility." Docket No. 19 at 11. A permissible inference that could be drawn from the challenged testimony was that she had not fabricated her testimony against King. As the

California Court of Appeal determined, the testimony was relevant to credibility as it responded to the defense efforts to show that J. fabricated her testimony and tended "to discount the inference that she was maintaining her allegations under compulsion by the prosecution." *King,* at *6. The jury could draw the inference that J. was truthful in her testimony against King. Because this inference is permissible, the state appellate court did not unreasonably apply Supreme Court authorities in holding that the admission of the evidence did not violate due process. *See Jammal*, 926 F.2d at 920.

King argues that the fact that J. had approved of a plea agreement whereby King would have been released in exchange for time served and a plea of guilty to committing a lewd act with a child under age 14 shows that J.'s purported motivation was false. Docket No. 19 at 11-12. According to him, the approval of the plea agreement allowing his release from a prison undermines her statement that she was testifying to protect her children. His contention is better suited to a closing argument trying to convince the jury that J.'s testimony should not be believed rather than a habeas petition trying to show that the statement's admission violated due process. In any event, King's reliance on this seeming paradox is incomplete and unconvincing. J.'s approval of the plea agreement and her motivation to protect her children were not contradictory because, as the California Court of Appeal explained, such a plea agreement would have resulted in a lifetime sex offender registration requirement and associated restrictions for King, which would "have protected J.'s children to some extent, while her failure to testify might have allowed defendant to be released without any such restrictions." *King*, at *6 n.11.

Finally, King argues that even if permissible inferences could be made, the inference that he "was a serial pedophile who would molest other children unless he was incarcerated" was not permissible. Docket No. 19 at 10. Invoking *Boyde v. Brown*, he writes, "when permissible and impermissible inferences can be drawn from a particular item of evidence, 'admission of that evidence [does] not violate due process, so long as the jury was instructed that it could not draw any improper inferences from it.'" Docket No. 19 at 10 (quoting *Boyde v. Brown*, 404 F.3d 1159, 1172-73 (9th Cir. 2005)) (alteration in original). But *Boyde* does not control here because it is a circuit-level rather than a Supreme Court holding and, in any event, was not applying the AEDPA.

*See Boyde*, 404 F.3d at 1163 n.4.  There is no Supreme Court holding that the admission of prejudicial evidence violates due process unless the jury is also instructed not to draw an impermissible inference.

"[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  Bearing in mind the extremely general nature of the Supreme Court's articulation of a principle of "fundamental fairness" – i.e., evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process, *see Dowling*, 493 U.S. at 352 – the California Court of Appeal's rejection of King's due process claim was not contrary to or an unreasonable application of clearly established federal law as set forth by the Supreme Court.  *See generally Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (denying writ because, although Supreme Court "has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ") (internal citation omitted).

B.      Due Process Claim Based On Part Of CSAAS Expert Testimony

King contends that the trial court violated his rights to due process and a fair trial by overruling his objections to testimony by the prosecution's expert on Child Sexual Abuse Accommodation Syndrome (CSAAS) that children rarely make false child sexual abuse accusations.

14

1. <u>Background</u>

The Court of Appeal summarized the trial background and then rejected the state and federal claims pressed by King:

> The prosecution's CSAAS expert testified on direct examination about the five components of CSAAS: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction. (Footnote omitted.) The expert explained that CSAAS is "an educational tool, not a diagnostic tool," and "[i]t would be improper for me to have an opinion related to whether a particular person was abused or not...."
>
> On cross, defendant's trial counsel asked the expert: "Now, some children who recant or retract their story do that because they weren't ever molested in the first place; right?" The expert responded: "False allegations of sexual abuse do occur, yes." A discussion of recantation rates ensued. The prosecution did not challenge the relevance of this line of questioning despite the fact that there was no evidence that J. had ever recanted her allegations. The expert testified that, although studies produced different estimates of recantation rates varying from 3 percent to 50 percent, he believed that the most reliable study had concluded that the rate was 20 to 25 percent. Defendant's trial counsel then asked the expert: "So, now there are text books and psychological [sic ] that also talks [sic ] about retraction in cases where the allegation is simply not true; correct?" The expert responded: "That may well be. I don't know."
>
> The questioning then moved on to the issue of unconvincing disclosures. Defendant's trial counsel asked the expert: "And sometimes children that haven't been abused keep giving, as you call it, unconvincing disclosure; right?" The expert responded: "I would imagine that there were children who have not been abused who make a disclosure of sexual abuse, and that disclosure of sexual abuse may not be convincing; but that it not part of [CSAAS] because if you haven't been abused, then we're not talking about [CSAAS]." The expert denied any knowledge about how children who have not been abused make false allegations. Defendant's trial counsel asked: "Well, would you agree with me, Doctor, that sometimes the reason that the disclosure is not very convincing is because it didn't happen." The expert responded: "Again, my professional experience I've had—not had enough instances to be able to rely upon it. I've had a couple instances where I've been involved in cases where there is a false allegation, and I don't know of any research about how kids who have not been sexually abused and are making false allegation[s] disclose their allegation of abuse. I don't know that—I don't think I can answer that question." The expert repeated that the premise of CSAAS "is that we're assuming that the child has been sexually abused."
>
> On redirect, the prosecutor elicited the expert's testimony that "there's a lot of controversy with regard to kids retracting." The following colloquy then occurred. "Q [The defense] asked you about

false allegations. [¶] A Correct. [¶] Q Has research been done in the area of false allegations? [¶] A Yes. [¶] Q And, specifically, the rate of false allegations? [¶] A There has been research that cited the frequency of false allegations, yes. [¶] Q What has that research shown? [¶] A There's probably maybe ten to fifteen studies, empirical studies, that have looked at rates of false allegations. And there's a caveat here ... [because] research on something that didn't happen ... is a really tough thing. [¶] So given that caveat, the rates of false allegations, for most of the empirical studies, fall within the range of about one percent to six percent. Probably the best article which—and that's why people ask me often does it happen? I usually say very infrequently or rarely. [¶] One of the best studies is a study by ... Neil Trocme and Bala. It's a Canadian incident study of false allegations. What they found is about one percent of the children who were identified in some form by law enforcement or CPS—"

At this point, defendant's trial counsel moved to strike this testimony "as beyond the cross-examination" and irrelevant. "I don't see how the false allegation evidence is relevant here. It's somewhat misleading to the jury." The prosecutor asserted that he was following up on defendant's trial counsel's questioning about false allegations. Defendant's trial counsel insisted that he "didn't bring up any issues about research on false allegations." He claimed that his questioning had been about the fact that CSAAS "doesn't take into account false allegations." The court overruled the objection. The expert then continued with his answer. "I think I was referring to the Trocme–Bala study, which was a Canadian incident study in which they found about one percent of the cases that came before law enforcement or CPS were deemed to have been false allegations. And in none of those situations did the child make the false allegation; they were made by somebody else besides the child." Defendant's trial counsel renewed his objection, and the court overruled it.

The prosecutor mentioned the CSAAS evidence in her argument to the jury, but she emphasized that the expert "wasn't here to tell you that J[.] was or wasn't assaulted by the defendant...." "[CSAAS] does not diagnose abuse." Defendant's trial counsel expressly referred to the expert's testimony regarding "false accusations." "[The expert] testified that false accusations ... in sex cases are rare. Well, whether that's true or not, percentages are not what this case, or any criminal case is about.... This case is about whether this is a false accusation in this case period."

The court instructed the jury on the limited purpose for which it could use this expert's testimony. "[The expert's] testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not J[.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

*King*, at *18-19.

16

The California Court of Appeal found no state law error in the admission of the evidence. That court disagreed as a factual matter with King's suggestion that the expert's testimony that children "'rarely' make false allegations 'was tantamount to saying that J. 'was telling the truth.'" *King*, at *20. Given the expert's testimony, "it is inconceivable that the jury could have understood the expert's testimony about false allegation rates to be a verification of the truth of J.'s allegations particularly in light of the trial court's instruction on the limited use that the jury was permitted to make of this expert's testimony. In sum, the expert's testimony as a whole and the limitations imposed by the instruction rendered it improbable that the jury could have utilized the challenged testimony in any inappropriate way." *Id.*

The California Court of Appeal also rejected King's claim that the evidence violated his federal right to due process: The state appellate court explained that King's reliance on *McKinney v. Rees,* 993 F.2d 1378 (9th Cir. 1993) was "misplaced" because the evidence in *McKinney* was irrelevant, no permissible inferences could be drawn from it, and the evidence was a significant part of the prosecution case. By contrast, in *King's case,* "the prosecution did not rely on the false allegation rate evidence but merely elicited it for its relevance to rebut the inference that the defense sought to create that the incidence of retraction among child sexual abuse victims reflected a similar incidence of false allegations. Rebutting that inference was not irrelevant, and this evidence was otherwise insignificant. No federal constitutional violation occurred." *King*, at *20.

2. Analysis

As mentioned in Section A.2, above, evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process. *Dowling*, 431 U.S. at 352.

King argues that the state appellate court unreasonably decided his claim because the defense "did not seek to create an inference that the incidence of retraction among child sexual abuse victims reflects a similar incidence of false allegations" but only "that some of the reports that are recanted actually could have been false to begin with." Docket No. 19 at 26. This argument does not support habeas relief because the state appellate court reasonably determined

that one possible inference from the defense counsel's cross-examination was that the rate of recantations reflects the rate of false allegations. Whether this inference was intended by the defense counsel or not does not matter. The fact that such inference was possible made evidence to the contrary relevant. That is, the prosecution could present evidence to dispel the idea that the rate of recantations equaled the rate of false accusations. King also argues that the expert's testimony on redirect examination "that children 'rarely' make false allegations was tantamount to a propensity inference, which historically is impermissible." Docket No. 19 at 27. Even if it was propensity evidence, the Supreme Court has left open the question whether propensity evidence violates due process, as discussed in Section A.2, above. *See Estelle v. McGuire*, 502U.S. 75 n.2. Further, there was a permissible inference to be drawn from the evidence, i.e., that the rate of recantations is not indicative of the rate of false allegations.

King argues finally that the "jury would have reasoned that if false allegation rates are in the one percent range, then J.'s testimony was unlikely to be false" which "necessarily involved using that testimony to determine whether petitioner committed the charged crimes." Docket No. 19 at 28. That is not so. The expert acknowledged on cross-examination that "'[f]alse allegations of sexual abuse do occur, yes,' and he also explained that he himself had been 'involved in [a couple of] cases where there is a false allegation.' He also testified on direct that '[i]t would be improper for me to have an opinion related to whether a particular person was abused or not.'" *King*, at *20 (alterations in original). The jury was instructed by the trial court that "this expert's testimony was not evidence of the truth of J.'s allegations but only evidence to be used in 'evaluating the believability of [J.'s] testimony.'" *Id.* The prosecutor's closing argument also did not urge the jury to accept the expert's testimony as direct proof that King had committed the crime. Indeed, the prosecutor argued that the jury should not use statistics to determine guilt.[3] Given the caveats by the expert, the instructions by the court, and the closing arguments, the

---

[3]The prosecutor urged in his closing argument that the expert "wasn't here to tell you that J[.] was or wasn't assaulted by the defendant," and "[CSAAS] does not diagnose abuse." *King*, at 19. And defense counsel reminded the jury that "percentages are not what this case, or any criminal case, is about. . . . This case is about whether this is a false accusation in this case period." *Id.*

challenged evidence did not render the trial fundamentally unfair. King cannot obtain federal habeas relief on this claim because he has not shown an error by the California Court of Appeal's decision that is so clear as to be "beyond fairminded disagreement." *Harrington*, 562 U.S. at 103.

C.    Confrontation Clause Claim Based On Termination Of Recross-Examination Of J.

King next contends that his Confrontation Clause rights were violated when the trial court terminated his recross-examination of J. This termination occurred after several hours of testimony from J., and following a time warning to defense counsel by the court when the questioning became repetitive.

1.    Background

J. testified for "much of" one day during trial. Resp. Ex. C, Appellant's Opening Brief at 41. Her testimony on direct examination lasted for 45 pages of transcript, and her testimony on cross-examination lasted for 73 pages of transcript and "took somewhat longer than two and a half hours." *Id.* J.'s further testimony on redirect examination lasted for 17 pages of transcript, and her testimony on recross-examination lasted for 10 pages before the recross-examination was stopped by the trial court. *Id.* at 42-43.

> On recross, J. was first asked several questions about who she told first, Meharg or her mother. Then, she was asked about the sequence of events in the garage. After numerous questions on this subject, this colloquy occurred: "THE COURT: I think this has all been asked and answered at least once. [¶] [Defense counsel]: She went back into this in redirect. [¶] THE COURT: You've got about five, [defense counsel], so take your shots." Defendant's trial counsel proceeded to show J. photos of the house and asked about the window in the door between the kitchen and the garage. He went on to ask briefly about "why you're back here today." The next area of questioning was about the incident in the living room that she had "misremembered" followed by questions about J.'s letters and her diary entries. Defendant's trial counsel further questioned J. about the carpet and its color.
>
> After a group of questions about the carpet, the prosecutor objected that "this has all been asked and answered." The following then occurred. "THE COURT: Sustained. In fact, we're going to end this right now because this could go on forever the way you're approaching it. [¶] So ladies and gentlemen, we're going to take the evening recess at this time. We're recessing until next Monday, the

> 1st of March, at 9:00.[¶] [The Prosecutor]: Your Honor, may we
> approach first? [¶] THE COURT: Sure." An off-the-record sidebar
> occurred, and then the court recessed. Defendant's trial counsel
> made no objection on the record.

*King*, at *7-8.

On the next court day (which was a week later), the prosecutor stated that the trial court had excused J. as a witness at the sidebar at the end of J.'s testimony, and she had returned home to Colorado. Defense counsel objected to the termination of J.'s recross-examination without the defense having excused the witness, said the defense had more questions for her, and complained that the defense had no opportunity to object to the court's ruling on the preceding court day. The court responded that no one had objected when he said the witness was going to be excused, and that the court had excused her in furtherance of its duty to control the proceeding. RT 2107. The trial court further explained that it "felt that defense had more than adequate opportunity to examine and cross-examine this witness. The cross-examination was far longer than the direct, which is pretty much unusual, then went back for a second round. I did warn [defendant's trial counsel] that he had about ten minutes. It went on well past that. And, finally, I felt that it was necessary to call a halt because, as the District Attorney points out, it didn't seem like we were covering any new ground; we were simply rehashing things one more time." RT 2107-08.

The California Court of Appeal rejected King's Confrontation Clause claim. The court determined that the right of confrontation applied to recross-examination as well as cross-examination, and noted that sometimes recross-examination might be critical when redirect examination uncovers new information, but that was not the situation here. The state appellate court concluded that the trial court's termination of the recross-examination of J. did not violate King's right to confrontation.

> The only additional matters addressed on redirect were J.'s
> motivation for testifying, followup on her testimony on cross about
> the living room incident and her diary entries and letter, J.'s inability
> to recall whether she had touched defendant's penis, and J.'s
> testimony about the locations of defendant's hands during the
> incident. At the point when the court notified defendant's trial
> counsel that "I think this has all been asked and answered at least
> once," and told him that "You've got about five, [defense counsel],
> so take your shots," the questions on recross had not been devoted to
> any new material but instead had been primarily devoted to topics
> already well covered on cross. Following this warning, defendant's

20

United States District Court
Northern District of California

trial counsel moved on to questions about the living room incident, entries in J.'s diary, and her letter. After that, however, he returned to the topic of the carpet, which had already been addressed on cross. By this time, defendant's trial counsel had clearly exceeded the "five" that the trial court had warned him he had left for his "shots," and he had returned to asking questions that had already been answered. Because defendant's trial counsel had already been warned by the trial court, and he had chosen to return to an old rather than new topic, the trial court could reasonably conclude that he had exhausted his questions about any new topics. When defendant's trial counsel persisted with further questions about the carpet, and the prosecution interposed an "asked and answered" objection, the trial court was well within its discretion in deciding that it was necessary to terminate recross because further recross would be "repetitive or only marginally relevant," and would only serve to harass J. (*Delaware v. Van Arsdall, supra,* 475 U.S. at p. 679.) The trial court did not violate defendant's right to confrontation by doing so.

*King*, at *9.

2.    Analysis

The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Trial judges retain wide latitude to impose reasonable limits on cross-examinations based on concerns about, among other things, "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). A defendant "can prove a violation of his Sixth Amendment rights by 'showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness,' and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Holley*, 568 F.3d at 1098 (omission in original) (quoting *Van Arsdall*, 475 U.S. at 680). A showing of constitutional error under the Confrontation Clause only merits habeas relief if the error was prejudicial, that is, if it had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 1100 (9th Cir. 2009) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

United States District Court
Northern District of California

The California Court of Appeal correctly identified the controlling Supreme Court rules from *Van Arsdall* and *Fensterer*. *See King*, at *16 (quoting *Delaware v. Van Arsdall*, 475 U.S. at 679; *People v. Wilson*, 44 Cal. 4th 758, 794 (Cal. 2008) (quoting *Delaware v. Fensterer*, 474 U.S. at 20); and *People v. Quartermain*, 16 Cal. 4th 600, 623-24 (1997) (citing *Van Arsdall*, 475 U.S. at 680)).

The California Court of Appeal's determination that the trial court had not violated King's Confrontation Clause rights by terminating the repetitive recross-examination following a caution to the defense was not an unreasonable application of Supreme Court precedent. *Van Arsdall* gives trial judges "wide latitude" to impose reasonable limits on cross-examination based on concerns about questioning "that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679; *see, e.g., Plascencia v. Alameida*, 467 F.3d 1190, 1201 (9th Cir. 2006) (exclusion of cross-examination that would have provided cumulative or repetitive evidence did not violate Confrontation Clause or was harmless error); *Bright v. Shimoda*, 819 F.2d 227, 229-30 (9th Cir. 1987) (no constitutional violation where substantial cross-examination permitted and excluded evidence was of collateral nature); *Batchelor v. Cupp*, 693 F.2d 859, 865 (9th Cir. 1982) (Confrontation Clause satisfied where trial judge restricted cross-examination of key witnesses as to drug use where evidence of such use was already before jury).

The defense was allowed to cross-examine J. extensively (*see* RT 1816-88, 1906-16). The trial court only terminated the recross-examination after it had become repetitive, and the court's concern with its repetitive nature had been made known to the defense. The court had on its own observed that the area of examination "has all been asked and answered at leas[t] once" and gave the defense "about five" minutes, RT 1910; later, the court had sustained a prosecution objection to other questions as "asked and answered" and "outside the scope of redirect," RT 1914; and the court only stopped the recross-examination when the prosecutor raised another "asked and answered" objection to yet more questions about the carpet, RT 1916.

The trial court did not restrict the subject-matter that the defense could explore on recross-examination, such as disallowing any questions about the carpet or the sequence of the assault. That makes this case unlike those cases where Confrontation Clause violations have been found

based on the trial court refusing to allow any examination on a particular topic. *Cf. Holley*, 568 F.3d at 1098-1100 (trial court's preclusion of cross-examination of complaining witness about her "statements regarding certain sexual acts or the desires others felt for her" in child molestation case violated defendant's Confrontation Clause rights). In fact, one of the suggestions from the Ninth Circuit is to place time limits on testimony, rather than foreclose a particular area of inquiry. *See id.* at 1100 ("[T]he court could have limited the time allotted to discussion of the [objectionable topic], rather than excluding all discussion"); *Fenenbock v. Director of Corr.*, 692 F.3d 910, 920 (9th Cir. 2012) (seven-hour limit on duration of cross-examination of juvenile reasonable under Supreme Court's Confrontation Clause precedents). That is what the trial court did here when it told defense counsel that he had "about five" to wrap up his recross-examination. Although five minutes is a rather limited amount of time, it must be remembered that the limit was announced after the witness had been on the witness stand for much of the day, including more than two and a half hours of cross-examination.

King does not dispute that the defense was asking questions that had already been answered, but claims that such questioning "can be useful to establish a foundation for inquiry about new matters." Docket No. 1 at 25. But this view would allow limitless cross-examination, which is not what *Van Arsdall* requires. As respondent points out, if trial counsel actually had new material to cover, he could have done so after the trial court warned him that the end of his examination was near or he could have told the court of his planned questioning during the sidebar conference when the witness was still in the courtroom. King argues in his traverse that the defense was addressing a "topic of critical importance," i.e., "that an investigator had told J. that no semen was found on the carpet when it was tested." Docket No. 19 at 18. But those questions *were* allowed and were answered. After the defense asked about the investigator's statements to J., defense counsel returned to more questions about the carpet that covered the same ground as in his cross-examination -- whether J. had said the carpet had been chewed by a dog, cut by her mother, and thrown away, *compare* RT 1915-16 *with* RT 1883-84 -- and only then did the trial court stop the examination. King has not shown that a "reasonable jury might have received a significantly different impression," *Van Arsdall*, 475 U.S. at 680, of J.'s credibility had the

23

defense been permitted to continue with the recross-examination.

King received an opportunity for effective cross-examination. He is not entitled to relief because the state appellate court's determination that there was no constitutional error was not contrary to, or an unreasonable application of, any holding of the U.S. Supreme Court.


D.  Confrontation Clause Claim Based On Trial Court's Refusal
    To Allow Cross-Examination Of J. With Excerpt of Police Interview

King next contends that his Confrontation Clause rights were violated when the trial court refused to let him cross-examine J. with a particular video clip.

During the cross-examination of J., defense counsel asked J. if she recalled telling the police that she had told her mother everything and J. said she did not recall. Defense counsel then asked to show her Exhibit Z, which was a 12-second excerpt from the video recording of J.'s interview by a police detective in 1997. "At the beginning of it, J.'s head is up, and her arms are crossed on the table. Before any dialog occurs, J. drops her head to her arms. The only dialog is the detective's brief statement, which occurs after J. drops her head to her arms. The detective says that J.'s mother had told the police that J. had told her that defendant 'tried to have sex' with her but 'never did have sex' with her. J.'s head remains on her arms while the detective speaks." *King*, at *16. Although Exhibit Z was not played during J.'s testimony, it was played during the cross-examination of the detective and was played again by defense counsel during his closing argument.

The California Court of Appeal rejected King's argument that the trial court's refusal to let him show Exhibit Z to J. during cross-examination violated his right to confront her. Excluding Exhibit Z during J.'s testimony was a reasonable limit on cross-examination because the exhibit was unduly confusing, according to the appellate court.

> The trial court's limitation on the defense's use of exhibit Z did not
> violate defendant's confrontation rights. The trial court reasonably
> precluded use of exhibit Z during J.'s testimony because exhibit Z
> was so truncated that it was confusing. At that point, the jury had
> seen no portion of the interview video. The dialog that *preceded* J.
> putting her head down was not included in exhibit Z, so it was

1
2
3
4
5
6
7
8
9

> unclear exactly what had prompted J. to put her head down. In contrast, during its cross-examination of J., the defense was able to elicit from her an admission that she had "changed [her] story" after the police told her that her mother had told them something different about J.'s disclosure to her. While exhibit Z might have added emphasis to that point if it had included the dialog that prompted J. to drop her head, it lacked significance in its absence. Furthermore, it was improbable that the jury would have "received a significantly different impression" of J.'s credibility if only this snippet had been played during J.'s testimony on cross-examination rather than being played twice later in the trial. The defense made its point. J. admitted that her original statement to the police that she had told her mother everything about defendant's assault on her was not true. She also admitted that she had changed her story after the police confronted her with her mother's statement that J. had told her only that defendant had tried to rape her. Showing J. exhibit Z would not have added anything of significance to J.'s admissions, particularly considering that it was shown to the jury twice later in the trial.

10  *King,* at *17.

11          King is not entitled to habeas relief on this claim. The same Confrontation Clause rules as

12  those identified in Section C.2, above, apply to this claim. The California Court of Appeal

13  correctly identified those controlling Supreme Court rules from *Van Arsdall* and *Fensterer. See*

14  *King,* at *16. The state appellate court's application of those rules was a reasonable one. The

15  video had no dialog to accompany the ambiguous movement by J. made more than a decade

16  before the cross-examination. The exclusion of that video was a reasonable limitation on cross-

17  examination, well within the wide latitude granted trial courts to impose reasonable limits on

18  cross-examination, as the state court reasonably determined. *See Van Arsdall*, 475 U.S. at 679.

19  Moreover, King was able to and did cross-examine J. on the substantive points of what she had

20  told her mother and what she had told the police. King received that which the Confrontation

21  Clause guarantees: "an *opportunity* for effective cross-examination, not cross-examination that is

22  effective in whatever way, and to whatever extent, the defense might wish." *Fensterer*, 474 U.S.

23  at 20. Given the other cross-examination that was done of J., the state appellate court's conclusion

24  that the jury would not have received a significantly different impression of J.'s credibility if the

25  jury had seen the video clip without any dialog or context for J.'s ambiguous movement was a

26  reasonable conclusion. The writ will not issue on this claim.

27
28

25

E.   Confrontation Clause Claim Based On
     <u>Admission of Prior Statements and Testimony From J.</u>

J.'s earlier statements were admitted into evidence after she had been excused as a witness and was no longer at the trial. The evidence in question was a 1997 police interview and the transcript of J.'s trial testimony in 1997. The 1997 police interview video and transcript thereof were listed by the prosecution as trial exhibits. During J.'s testimony on direct examination and cross-examination, J. was shown portions of her 1997 trial testimony transcript and her 1997 police interview transcript to try to refresh her recollection -- sometimes successfully refreshing her recollection and sometimes not. After J. had been excused as a witness, the prosecution filed a written motion seeking admission of portions of the 1997 trial transcript and 1997 police interview video. The trial court eventually ruled, over a defense objection, that the proffered evidence was admissible. The defense then obtained admission of additional portions of the interview and trial testimony. *King*, at 11-12. The prosecutor played a portion of the interview video during the testimony of the detective who had conducted the interview. *Id.* at 12.

On appeal, King argued that the admission of the video, the interview transcript and portions of J.'s 1997 trial testimony violated his Confrontation Clause rights because J. had been excused as a witness before the evidence was admitted into evidence and she was no available for cross-examination. He further argued that the prosecutor was required to, but did not, establish that J. was unavailable so that her prior statements could be admitted. The California Court of Appeal identified *Crawford v. Washington*, 541 U.S. 36 (2004), as the controlling case, and relied on it to reject King's claim.

The Confrontation Clause of the Sixth Amendment gives the accused the right in a criminal trial to "be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause applies to all "testimonial" statements, *Crawford*, 541 U.S. at 50-51, which the statements here were. Out-of-court testimonial statements are barred under the Confrontation Clause unless (1) the witness is unavailable, and (2) the defendant had a prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 59. However, the Confrontation Clause does not bar the admission of testimonial hearsay when the declarant appears for cross-examination at trial. *Id.* at 59 n.9 (citing *California v. Green*, 399 U.S. 149, 162 (1970)). For example, the Confrontation

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    Clause is not violated by the admission of a prior identification by a witness who testifies but is

2    unable, because of memory loss, to testify concerning the basis for the identification. *See United*

3    *States v. Owens*, 484 U.S. 554, 564 (1988).[4]

4          In footnote 9 in *Crawford*, the Supreme Court made the following statement upon which

5    King relies for his argument:

6            Finally, we reiterate that, when the declarant appears for cross-
             examination at trial, the Confrontation Clause places no constraints
7            at all on the use of his prior testimonial statements. *See California v.
             Green*, 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). It
8            is therefore irrelevant that the reliability of some out-of-court
             statements "'cannot be replicated, even if the declarant testifies to
9            the same matters in court.' " *Post*, at 1377 (quoting *United States v.
             Inadi*, 475 U.S. 387, 395, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)).
10           The Clause does not bar admission of a statement so long as the
             declarant is present at trial to defend or explain it. (The Clause also
11           does not bar the use of testimonial statements for purposes other
             than establishing the truth of the matter asserted. *See Tennessee v.
12           Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985).)

13   *Crawford*, 541 U.S. at 59-60 n.9.

14         King argues here, as he did in the state appellate court, that footnote 9 of *Crawford* shows

15   that a Confrontation Clause violation occurred because his cross-examination of J. took place

16   before her prior testimonial statements were admitted into evidence. In his view, the statements

17   were inadmissible because J. was not present at trial to defend or explain them at the appropriate

18   time. The California Court of Appeal rejected his interpretation of footnote 9.

19           *Crawford* did not mandate that the admissibility of a prior statement
             of a witness who is present for cross-examination at trial depends on
20           whether the witness has actually been confronted with the prior
             statement and required to or had the opportunity to defend or explain
21           the prior statement. Here, because J. "appear[ed] for cross-
             examination at trial, the Confrontation Clause place[d] no
22           constraints at all on the use of [her] prior testimonial statements."

23   _____

24         [4] In *Owens*, the victim's memory was impaired after a criminal attack. 484 U.S. at 556.
     While at the hospital, the victim described the attack and identified the defendant as his attacker.
25   *Id.* At trial, the victim testified that he remembered identifying the defendant, but could not
     remember actually seeing the attacker. *Id.* The Supreme Court held that there was no
26   Confrontation Clause violation because the Confrontation Clause only guarantees an *opportunity*
     for effective cross-examination, and the defendant had such an opportunity. *Id.* at 559. When the
27   witness is present, "the traditional protections of the oath, cross-examination, and opportunity for
     the jury to observe the witness' demeanor satisf[ied] the constitutional requirements." *Id.* at 560
28   (citing *Green*, 399 U.S. at 158-61).

(*Crawford, supra*, 541 U.S. at p. 59, fn. 9.)

> Defendant complains that he "was never given the opportunity to cross-examine J[.] about the particulars" of the prior statements. Not so. The defense extensively cross-examined J. about "the particulars" of her prior statements, repeatedly using the trial transcript and the interview transcript to refresh her recollection and to point out her inconsistencies. Nor should it have been a surprise to the defense that the prosecution obtained admission of this evidence. The interview transcript and the video were both on the prosecution's exhibit list attached to its trial brief, and the prosecution used the trial transcript repeatedly throughout its direct examination of J. to refresh or attempt to refresh J.'s recollection. Hence, we reject defendant's claim that the defense "was taken utterly by surprise and was justifiably outraged" by the prosecution's "sandbagging" request for admission of this evidence.

*King*, at *14.

No Supreme Court case gives a clear answer to the question whether the witness must be on the witness stand at the time her prior testimonial statements are admitted into evidence. King makes a reasonable argument that footnote 9 in *Crawford* supports his position that the witness must be present on the witness stand, but that footnote is equally susceptible to the opposite reading, i.e., as long as the witness is put on the witness stand at some point in the present trial, her prior statements may be admitted into evidence. The fact that there are two reasonable readings of what footnote 9 requires is fatal to King's habeas claim. When U.S. Supreme Court "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, 'it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.' Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized." *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (second and third alterations in original) (quoting *Carey v. Musladin*, 549 U.S. 70, 77 (2006), and 28 U.S.C. § 2254(d)(1)).

*Crawford's* footnote 9 has not been clarified by the Supreme Court. The only post-*Crawford* case arguably coming near the topic is *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009), in which the Supreme Court explained that the ability of a defendant to subpoena the witness does not satisfy the Confrontation Clause because the burden is on the prosecution rather than the defense to present the witness. *Id.* That case found a Confrontation Clause violation in a drug trafficking case when affidavits reporting the results of forensic drug analysis were admitted into evidence without the analysts actually testifying. *Melendez-Diaz* addressed the situation of

the absent witness, not the situation where the witness did testify but was excused as a witness before her prior statements were admitted into evidence. Like *Crawford*, *Melendez-Diaz* does not provide a rule that controls King's facts where the witness did testify, but did so before the prior statements were admitted.

King argues that the pre-*Crawford* case of *California v. Green*, 399 U.S. 149 (1970), supports his position. But *Green* does not have a holding that the witness must be on the witness stand at the time the prior statement is admitted into evidence. In *Green*, the witness was present at trial and his statements from a preliminary hearing were admitted at trial after he claimed a memory loss. *Green* held that, because the witness was present at trial and the defendant was able to cross-examine him at trial, the defendant's confrontation right was not violated by the admission of the witness' preliminary hearing testimony. *Green* simply did not address the question, let alone issue a holding, whether the witness must be on the witness stand to be cross-examined at the time the prior statement is admitted into evidence.

One out-of-circuit case highlights the lack of guidance in this area. In *Peak v. Webb*, 673 F.3d 465 (6th Cir. 2012), the prosecutor introduced a testimonial statement of a codefendant who was on trial with Peak. Although the codefendant had waived his Fifth Amendment rights and was available for cross-examination, the prosecutor had not called him as a witness. Peak had not had any prior opportunity to cross-examine him. *Id.* at 469. The Sixth Circuit explained that it was an open question whether confrontation requires the witness to actually take the stand or merely that he be available at trial to be called and cross-examined when his prior statement is used. "The Supreme Court simply had not, at the time Peak's conviction became final, clearly held that the ability to cross-examine immediately is required by the Confrontation Clause." *Id.* at 473. Habeas relief was denied under § 2254(d) because there was a possibility for fair-minded disagreement whether the witness whose prior statement is to be introduced be made available in the courtroom for confrontation. *Peak*, 673 F.3d at 474.

Here, J. was cross-examined at the trial at which her prior testimonial statements were admitted into evidence. Although she was no longer on the witness stand when her prior testimonial statements were admitted into evidence, the defense was well aware of those prior

statements, had an opportunity to cross-examine her about those statements, and did in fact cross-examine her about those statements. Habeas relief is not available because the California Court of Appeal's determination that King's Confrontation Clause rights were not violated under these facts was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

F.    Due Process Claim Based On Jury Consideration Of Videotape Interview of J.

King next argues that the mistaken submission of the video of the police detective's interview of J. to the jury with other exhibits violated his right to due process. The video had been admitted into evidence.

The defense objected to the video of the police interview of J. being sent to the jury room with other exhibits, urging that the video would give undue weight to J.'s statement because it was the only video and "'creates an incredible amount of prejudice.'" *King*, at *20. The prosecutor responded that he was agreeable to having the video treated the same as a transcript, to be made available if the jury requested it. The trial court then said it was "'agreed'" that the video would not be sent to the jury room with other exhibits. In closing argument, the prosecutor told the jury that the video was available upon request. And the trial court informed the jury that the video would not be among the exhibits initially given to the jurors, but if they wanted to see the video or transcript of it they could so request and "'we'll make arrangements for you to be able to do that.'" *King*, at *20-21. Nonetheless, the video and transcript mistakenly went to the jury room with other exhibits.

After a day of deliberations, the trial court discovered that the video and transcript had been sent to the jury. The judge learned of this because the jury had asked the bailiff, "'wasn't there a defense video also?'" *King*, at *21. By then, the jury had reached a verdict, having deliberated for about a day. *See* CT 686-89. The defense wanted the jury to be instructed to disregard what they saw and heard on the video because it was sent to the jury in error. The prosecutor opposed that request because the video and transcript had been admitted into evidence.

1    The trial court denied the defense request.

2    The California Court of Appeal rejected King's claims of state law and federal

3    constitutional violations. California Evidence Code section 1137 allows a jury to take all

4    evidence, other than depositions, into the jury room. King had not shown that the mistaken

5    submission of the video violated state law or any federal constitutional right, as the few cases he

6    identified concerned the submission of videotaped testimony from the current trial or rules in

7    states that prohibited unfettered access to videos in the jury room.

> In this case, the video itself was admitted into evidence, and
> California law does not prohibit the jury from having exhibits
> available to it in the jury room. While we do not discount the risk
> that the jury may place considerable emphasis on a video of a
> witness statement that is available to it in the jury room, this is not a
> case in which the record can support an inference that the jury
> placed undue emphasis on the video to the exclusion of other
> evidence. Although the jury had the video in the jury room, it
> specifically requested and received a read back of J.'s *trial testimony*
> and of the trial testimony of two other witnesses. In any case, there
> is no basis in the record upon which we could base a conclusion that
> a verdict more favorable to defendant would have occurred if only
> the jury had been required to view the video in the courtroom rather
> than being permitted to do so in the jury room.
>
> Defendant contends that the record demonstrates that the presence of
> the video in the jury room was prejudicial to him. He relies on the
> court's statement that the jury had "inquired of the bailiff whether—
> wasn't there a defense video also?" He sees this comment as an
> unfulfilled request for exhibit Z, which apparently was not in the
> jury room. We do not agree with his interpretation. Exhibit Z was
> the only video introduced by the defense. As we have already
> pointed out, it was played to the jury twice at trial including during
> the defense closing argument. Since it was only 12 seconds long, it
> was highly unlikely that the jury had forgotten what it depicted. The
> juror's comment to the bailiff seems more likely to have been an
> acknowledgement that the juror recalled exhibit Z than a request for
> it. Had the jury really desired a replay of exhibit Z, it could have
> requested it in the same manner that it had requested read backs. Its
> failure to do so reflects that it did not desire a replay of exhibit Z.

24    *King*, at *22.

25    King also argues in his traverse that the video the jury saw was prejudicial because the jury

26    saw a version of the video that was different from that shown at trial. King argues that the version

27    of the video the jury saw suggested that he still lived at the house when J. was sexually assaulted.

28    The California Court of Appeal reasonably rejected this argument. *King*, at *23. The video did

31

1  differ in a minute way due to unskilled editing by the prosecutor, who had tried to eliminate

2  reference to King's parole, but the edit would not have misled the jury because the jury would

3  have known from the poor editing job (which left a sentence with an obvious discontinuity) and

4  the detective's follow-up question on the video (which asked why King was visiting) that

5  something had been left out in the editing room. *Id.* Further, the evidence at trial was

6  "undisputed" that King did not live at the house when the events in question took place: J. had

7  testified on direct and cross-examination that King did not live at the house when she and her

8  mother lived there. *Id.*

9      In his federal habeas petition, King identifies no U.S. Supreme Court holding supporting

10  his claim that the mistaken submission of the video to the jury violated his right to a fair trial.  The

11  only case he cites is *United States v. Binder*, 769 F.2d 595 (9th Cir. 1985), *overruled in part on*

12  *other grounds by United States v. Morales*, 108 F.3d 1031, 1035 (9th Cir. 1997).  In *Binder*, to

13  relieve the apprehension of several child-witnesses, the court allowed their testimony by videotape

14  rather than require live testimony in the courtroom.  During deliberations, the jury replayed the

15  videotape of their trial testimony in the jury room.  *Binder* determined that this replay procedure

16  placed prejudicial emphasis on their testimony.  *Binder* does not show King's entitlement to

17  habeas relief because it was a circuit-level rather than Supreme Court case; it was a direct appeal

18  and not controlled by the AEDPA; it did not decide a constitutional issue; and the videotape at

19  issue was recorded trial testimony, rather than a videotape of a prior interview of a witness who

20  testified in-person at the current trial.  King has not shown that the California Court of Appeal's

21  rejection of this claim was not contrary to or an unreasonable application of clearly established

22  federal law, as set forth by the U.S. Supreme Court. King is not entitled to the writ on this claim.

23

24  G.    Juror Misconduct Claim Based On Mention Of King Not Testifying

25      King asserts that his Sixth and Fourteenth Amendment rights to trial by an impartial jury

26  and to due process were violated because the jury discussed his failure to testify and the trial court

27  refused to hold an evidentiary hearing on the matter.

28

After trial, King filed a supplemental motion for a new trial in which he asserted, among other things, that the jury had committed misconduct by discussing the fact that he had not testified at trial. He attached to his supplemental motion for a new trial an unsigned declaration from one juror and a signed declaration from a defense investigator reciting that the juror had reported that the jury discussed the fact that King did not testify but did not want to sign the declaration.[5] The prosecutor opposed the motion on the ground that King had not produced competent evidence of juror misconduct: the unsigned juror declaration was not evidence and the investigator's declaration about the juror's statement was hearsay. The prosecutor submitted signed declarations from two other jurors, who stated that the jury discussed briefly (i.e., for one or two minutes) that King did not testify, and the discussion terminated when one juror reminded the other jurors that they were not supposed to consider the fact that King had not testified. At the hearing on the motion for a new trial, the trial court declined to order an evidentiary hearing, determined that the unsigned juror declaration was not competent evidence, and refused to allow three jurors who had been subpoenaed to testify because "it's inappropriate to drag jurors in here at this kind of proceeding without any notice or justification or authorization by the Court." RT 5103-04.[6]

The California Court of Appeal rejected King's contention that there had been juror misconduct and that the trial court had erred in not holding an evidentiary hearing. The state appellate court only discussed the state law aspects of the claims. California law requires a court considering a motion for new trial based upon jury misconduct to use a three-step approach: (1) the court must first determine whether the affidavits supporting the motion are admissible; (2) if

_____

[5] There were other unsigned juror declarations, but those declarations did not pertain to the claim that the jury had discussed King not testifying.

[6] The trial court explained: "The court feels it's inappropriate to drag jurors in here at this kind of proceeding without any notice or justification or authorization by the Court. The purpose of proceeding by declaration is for the Court [to] decide whether or not it's appropriate to pursue the matter any further. I don't think the defense is authorized to go off on its own to start dragging [them] into court. [¶] The Court refuses to listen to this." RT 5103-04. "The Court feels that you're proceeding in an unlawful fashion dragging jurors into court without any authorization from the Court." RT 5104.

33

the affidavits are admissible, the court must determine whether the facts establish misconduct; and (3) if there was misconduct, the court must determine whether the misconduct was prejudicial. *King*, at *25. Under California law, there was a rebuttable presumption that juror misconduct was prejudicial. The state appellate court determined under state law that "the jurors committed misconduct by violating the court's instruction not to mention defendant's failure to testify," but the presumption of prejudice that arose from that misconduct "was rebutted by evidence that the discussion was brief, nonsubstantive, and immediately terminated by an admonition that this was a matter that they were prohibited from considering." *King*, at *27.

The Sixth Amendment guarantees a criminal defendant the right to a fair trial by a panel of impartial jurors. U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961). The jury's verdict "'must be based upon the evidence developed at the trial.'" *Turner v. Louisiana*, 379 U.S. 466, 472 (1965). "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* at 472-73. Juror exposure to extraneous influences is considered juror misconduct, even when the exposure is not the juror's fault.

The evaluation of claims of juror misconduct depends on whether the misconduct is based on extrinsic influences or intrinsic influences. When the misconduct stems from an extrinsic or external influence, prejudice is presumed unless the government shows it was harmless. *See United States v. Remmer*, 347 U.S. 227, 228-29 (1954); *Xiong v. Felker*, 681 F.3d 1067, 1076 (9th Cir. 2012) (quoting *Remmer*, 347 U.S. at 228-29) ("The presumption of prejudice that arises from juror misconduct, although strong, is not conclusive; 'the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.'") The situation is different when the alleged misconduct is intrinsic to the jury's deliberations.

"[L]ong-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry." *Tanner v. United States*, 483 U.S. 107, 127 (1987). Federal Rule of Evidence 606(b) and California Evidence Code section 1150(a) prohibit the use of juror

testimony to impeach a verdict when that testimony relates to intrinsic matters, i.e., the internal, mental processes by which the verdict was rendered. *See id.* at 116-27 (discussing Fed. R. Evid. 606(b); *People v. Cox*, 53 Cal. 3d 618, 695-96 (1991) (discussing Cal. Evid. Code § 1150(a)).

Courts have repeatedly held that a jury's consideration of the fact that a defendant did not testify cannot support relief because such an event, although undesirable, is not extrinsic to the trial. For example, in *Raley v. Ylst*, 470 F.3d 792, 803 (9th Cir. 2006), the court denied habeas relief on a jury misconduct claim based on the jury's consideration of the defendant's decision not to testify. "The fact that Petitioner did not testify in his own defense is not extrinsic evidence. Although the jury's discussion of this issue clearly violated the trial court's instructions, what happened (or did not happen) in the courtroom was a part of the trial, not extrinsic to it. [The court] may not inquire into a jury's deliberations concerning the evidence at trial." *Id.* (internal citation omitted). Similarly, in *United States v. Rutherford*, 371 F.3d 634 (9th Cir. 2004), the jurors' statements that they had discussed a defendant's failure to testify at trial were held to be inadmissible under Federal Rule of Evidence 606(b) because they concerned internal influences on the deliberations. *Rutherford* explained that the exceptions under Federal Rule of Evidence 606(b) that permit a juror to testify as to whether "extraneous prejudicial information was improperly brought to the jury's attention" or "any outside influence was improperly brought to bear upon any juror," do not apply because testimony about a defendant's absence from the witness stand "does not concern facts bearing on extraneous or outside influences on the deliberation." *Rutherford*, 371 F.3d at 640. *Cf. Vasquez v. Walker*, 359 F. App'x 758, 759-60 (9th Cir. 2009) (rejecting habeas relief where petitioner presented declarations from two trial jurors who declared that, during deliberations, the foreman misstated the law and refused to allow most jurors to read the written instructions because Supreme Court precedent "'flatly prohibited the admission of juror testimony to impeach a jury verdict.'"); *United States v. Leung*, 796 F.3d 1032, 1038 (9th Cir. 2015) (juror's affidavit that other jurors discussed evidence and made up their minds about defendant's guilt before start of deliberations did not entitle defendant to new trial or evidentiary hearing). King is not entitled to habeas relief on his claim that the jury engaged in misconduct by discussing the fact that he did not testify because it concerns an intrinsic rather than an extrinsic

influence on the jury.

King also is not entitled to habeas relief on his procedural claim that the state court violated his rights by not holding a full evidentiary hearing on his juror misconduct claim. He has failed to identify any Supreme Court case requiring a hearing to consider potential juror misconduct that did not involve extrinsic evidence. The California Court of Appeal reasonably could have determined that the trial court was not required to hold an evidentiary hearing where the only competent evidence before the trial court showed that the discussion of King not testifying was brief and was terminated with a reminder from one juror to others that the jurors were not to consider the fact that King had not testified. King speculates that other jurors might have had different recollections than the two jurors whose signed declarations stated that the discussion was limited and terminated when a juror mentioned that the defendant's silence was not supposed to be considered. His unsupported speculation as to what might have happened during deliberations does not show that the state court's refusal to hold an evidentiary hearing was contrary to, or an unreasonable application of, any Supreme Court holding. King also suggests that an evidentiary hearing might have uncovered evidence that the jurors did use the absence of any testimony from him against him in their deliberations (*see* Docket No. 1 at 40 (arguing that some jurors may have "used that silence in their deliberations")), but fails to explain how he could have made such a demonstration at a post-trial evidentiary hearing, given that jurors' testimony as to their mental processes in deliberating is precluded by California and federal evidence rules. *See* Cal. Evid. Code § 1150; Fed. R. Evid. 606.

Finally, King argues that his position is supported by the cases of *Doyle v. Ohio*, 426 U.S. 610 (1976), and *Griffin v. California*, 380 U.S. 609 (1965). *Doyle* held that the "use for impeachment purposes of petitioner's silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause," *Doyle*, 426 U.S. at 619, and *Griffin* held that the Fifth Amendment's self-incrimination clause "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin*, 380 U.S. at 616. Neither of those cases pertained to jury discussions about a defendant not testifying, and neither had a holding regarding the defendant's right to an impartial jury. To grant relief

based on *Doyle* or *Griffin* would require a court to extend the rationales and holdings of those cases to a new situation. The Supreme Court has made clear that a state court's failure to extend a Supreme Court rule to a new context does not support relief under § 2254(d)(1). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014).

King cannot obtain federal habeas relief on his claim because there is no "clearly established Federal law, as determined by the Supreme Court of the United States" establishing that a jury's discussion of a defendant's failure to testify violates his Sixth and Fourteenth Amendment rights to trial by jury and due process. *See* 28 U.S.C. § 2254(d)(1). Without any clearly established federal law from the U.S. Supreme Court, the state court's adjudication of the claim cannot be said to be contrary to or an unreasonable application of such law. *See Carey v. Musladin*, 549 U.S. 70, 77 (2006); *see, e.g., id.* at 76-77 (given the lack of holdings from the Supreme Court and the wide divergence of the lower courts on the issue of the potentially prejudicial effect of spectators' courtroom conduct, the state court's determination that the petitioner was not inherently prejudiced by spectators wearing buttons depicting the murder victim was not contrary to or an unreasonable application of clearly established Supreme Court law); *Varghese v. Uribe*, 736 F.3d 817, 821 (9th Cir. 2013) (because there is no Supreme Court authority that squarely addresses petitioner's claim – that a criminal defendant's rights to counsel and due process are violated when the state court conditions his access to, and testing of, the prosecution's limited evidence on the disclosure of the test results to the prosecution – the state appellate court had no specific rule to apply, so its decision was not an unreasonable application of clearly established Supreme Court precedent.

H.    No Certificate of Appealability

A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is DENIED.


# CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED on the merits.

King's requests for the court to investigate his attorney and the prosecutor are DENIED. (Docket Nos. 32, 33.)  The court does not conduct investigations on behalf of litigants.

The clerk shall close the file.

**IT IS SO ORDERED.**


Dated:  August 19, 2016

_____
SUSAN ILLSTON
United States District Judge